# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO

In Re: )
)
Robert/Sherrie Haar )       **JUDGE RICHARD L. SPEER**
)
)       Case No. 06-33270
Debtor(s) )
)

## DECISION AND ORDER

This cause is before the Court after a Continued Hearing on the Debtors' Objection to the Motion of the United States Trustee to Dismiss Case pursuant to 11 U.S.C. § 707(b)(2) and (b)(3). With regards to its basis for dismissal under § 707(b)(2), this Court, in a prior Decision and Order entered on March 20, 2007, Denied the Motion of the United States Trustee to Dismiss. (Doc. No. 41). Accordingly, at the Continued Hearing, the evidence as well as the Parties' arguments were confined solely to the basis for dismissal set forth in § 707(b)(3).

In their arguments at the Hearing held on the Motion to Dismiss under § 707(b)(3), the Parties presented to the Court this legal issue for resolution: Whether income made available to the Debtors, as the result of them having surrendered their residence through the bankruptcy process, may be considered when determining the propriety of dismissing a case under § 707(b)(3)? As resolution of this legal issue was potentially dispositive on the matter of Dismissal, the Court afforded the Parties the opportunity to submit additional written arguments in support of their respective positions. These arguments have now been submitted to the Court, and after having had the opportunity to review them, as well as all of the evidence in this case, the Court finds as follows:

First, on the legal question raised by the Parties' arguments, the Court answers it in the affirmative. Hence, any income made available to the Debtors, as the result of the surrender of their residence, may be considered in an analysis to dismiss for abuse under § 707(b)(3). Second, when

**In re Robert and Sherrie Haar**
**Case No. 06-31270**

considering the availability of this income in light of the other factual matters presented at the Hearing, the Court finds that theDebtors' case should be Dismissed for abuse under § 707(b)(3). The reasons for this decision are now explained.

## FACTS

On May 31, 2006, the Debtors filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. In their petition, the Debtors set forth $49,451.00 in unsecured debt, – a figure which was later revised upward by $16.991.00 based upon a student-loan obligation not having been originally disclosed. (Doc. No. 53, U.S.T. Ex. No. 1). For assets, the Debtors disclosed a residence valued at $220,000.00, against which there existed a first and second mortgage having an aggregate value of $284,000.00. The Debtors have since surrendered this asset to the primary mortgage holder. (Doc. No. 17).

The Debtors' other assets of significance are four automobiles: a 2004 Olds Alero valued at $10,000.00; a 2002 Hyundai Accent valued at $3,500.00; a 2002 Ford Escort valued at $4,500.00; and a 1997 Hyundai Accent valued at $500.00. All but the last vehicle, the 1997 Hyundai which is owned free and clear, were disclosed in the Debtors' bankruptcy petition as being fully encumbered. According to the Debtors, two of these cars are provided to their two adult daughters, both of whom are presently full-time students.

Mr. Haar disclosed that he works two jobs: as a full-time lay minister, and approximately 10 hours per week as an independent delivery driver. Mrs. Haar disclosed that she works as a nurse for a county health department, a position which she has held for 13 years. (Doc. No. 1). From his employment, Mr. Haar's monthly salary totals $2,797.00, of which $700.00 is derived from his part-time job as a delivery driver; Mrs. Haar's monthly salary totals $4,434.00. *Id.* After accounting for mandatory deductions, the Debtors' combined monthly salary nets their household $5,650.95. *Id.*

Page 2

During the period following the filing of their bankruptcy petition, this figure has not, nor is it expected to significantly change. However, to the extent that there is a change in their household income, the Debtors indicated that it would likely be a positive adjustment, perhaps by as much as $200.00 per month.

Against their monthly net income, the Debtors disclosed in the schedules accompanying their bankruptcy petition that their monthly expenses totaled $6,176.50, thereby leaving their household with a monthly deficit of $525.55. *Id.* Included in the Debtors' monthly expenses were these items: (1) payments on two mortgages totaling $2,242.60; (2) real estate taxes of $250.00; (3) three auto payments aggregating $898.90; (4) auto insurance of $353.00; (5) gasoline for Mr. Haar's delivery job of $500.00; (6) telephone and cell phone charges totaling $140.00; (7) a payment for internet access of $40.00; and (8) cable service of $140.00. In the time period immediately following the filing of their bankruptcy petition, the Debtors' monthly expenditures experienced the following changes of significance.

First, based upon the surrender of their residence, the Debtors' payments on their two mortgages, totaling $2,242.60, have ceased; instead, the Debtors now pay rent of $888.00 per month. Other related housing expenses also diminished or were eliminated – for example, the Debtors are no longer obligated to pay $250.00 in monthly real estate taxes. On the other hand, certain expenditures of the Debtors increased. Particularly, as called to this Court's attention by the United States Trustee at the Hearing, the Debtors now pay $185.00 per month for cell phone service; according to the Debtors, this is for five phones, one for each member of the family, plus one phone for the home as they eliminated their land-line telephone access.

However, with the exception of these noted changes, the Debtors' monthly expenditures stayed more or less the same. For example, the Debtors are still allocating in their monthly budget the costs for maintaining four cars. In all, the Debtors now claim approximately $4,400.00 in

Page 3

necessary, monthly expenditures. Accordingly, when set against their net monthly income of $5,650.95, the Debtors' budget is now in the positive by at least $1,200.00.

## DISCUSSION

Before this Court is the Motion of the United States Trustee (hereinafter "UST") to Dismiss Case for Abuse pursuant to 11 U.S.C. § 707(b). For its Motion, the UST relies on § 707(b)(3) which provides:

> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider–
>
> > (A) whether the debtor filed the petition in bad faith; or
> >
> > (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

As a determination of dismissal under this section directly involves the ability of a debtor to receive a discharge and directly affects the creditor-debtor relationship, this matter is a core proceeding over which this Court has the jurisdictional authority to enter final orders. 28 U.S.C. §§ 157(b)(2)(J)/(O); 1334.

Section 707(b)(3) was added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act, otherwise known as BAPCPA, which became effective on October

Page 4

17, 2005.[1] As its introductory language imparts, § 707(b)(3) is a subordinate paragraph, utilized when determining whether a case should be dismissed under § 707(b)(1), the primary provision governing dismissal. In this way, § 707(b)(3) is but one of two subordinate paragraphs used to determine whether a case should be dismissed for abuse pursuant to § 707(b)(1). The other, contained in § 707(b)(2), sets forth a formulaic approach, known as the 'means test,' whereby a court is directed to presume that abuse exists if an ability to pay threshold is met. 11 U.S.C. § 707(b)(2)(A).

As previously noted, in its Motion to Dismiss the UST had sought to dismiss the Debtors' case in accordance with the 'means test' of § 707(b)(2). On this matter, the Court was presented with this legal issue: Whether a debtor was permitted to include in their 'means test' calculation of § 707(b)(2), payments made on secured property that will not ultimately be retained? *In re Haar*, 360 B.R. 759 (Bankr. N.D.Ohio 2007). It was the position of the UST that such payments were not permissible, thereby freeing up additional income for a debtor to repay their debts, and thus making it more likely that the presumption of abuse under § 707(b)(2) would arise. The Debtors, of course, took the opposite position as they were surrendering their residence against which they had been making significant monthly payments to service the property's secured debt.[2]

After analyzing the statutory language, as well as the pertinent case law which had already addressed the issue, the Court, following the majority position, found that a debtor, who surrenders secured property, is permitted to expense payments on that property when conducting the 'means

---

[1]Public Law 109-8, 119 Stat. 23.

[2]

For reasons not entirely clear, the Debtors' 'means test' calculation shows a monthly deduction for their home mortgage payment of $4,733.34, (Doc. No. 35), not the $2,242.60 as set forth in their original schedule J. (Doc. No. 1). A similar misalignment also exists for the Debtors' automobile payments.

Page 5

test' calculation of § 707(b)(2). *Id.* For the Debtors in this matter, the underlying effect of this ruling was favorable; no presumption of abuse arose in their case for purposes of § 707(b)(2). Beyond this holding, however, no further determination was made with respect to the UST's motion to dismiss the Debtors' case, hence necessitating the resolution of the matter now before the Court: the applicability of § 707(b)(3).

When determining whether the granting of relief under Chapter 7 would be an abuse, § 707(b)(3) provides that a court is to consider two separate grounds: (1) whether, as set forth in subparagraph (A), the debtor filed the petition in bad faith; and (2) as contained in subparagraph (B), whether the totality of the circumstances of the debtor's financial situation demonstrates abuse. In this case, the UST did not make any allegations that the Debtors acted in bad faith, instead relying exclusively on the 'totality of the circumstances' standard contained in subparagraph (B). For this, the UST argued that "this case should be dismissed under 11 U.S.C. § 707(b)(3) because the totality of the Debtors' financial situation demonstrates abuse due to the Debtors' ability to repay a substantial portion of their unsecured debt." (Doc. No. 31, at pg. 6).

In accord with the position taken by the UST, this Court, applying pre-BAPCPA case law, has recognized that a debtor's ability to repay a meaningful portion of their unsecured debt is a prime consideration in a 'totality of circumstances' analysis under § 707(b)(3). *In re Wright,* — B.R. —, 2007 WL 895757, *3 (Bankr. N.D.Ohio March 22, 2007).[3] In a similar way, in *In re Mestemaker,*

---

[3] Under pre-BAPCPA case law, the Sixth Circuit Court of Appeals recognized in *In re Krohn,* 886 F.2d 123, 126 (6th Cir.1989), and *Behlke v. Eisen (In re Behlke),* 358 F.3d 429, 434-35 (6th Cir. 2004), that, when weighing the totality of circumstances, a finding of abuse may "be predicated upon either a lack of honesty or want of need." *In re Krohn,* 886 F.2d at 126. The Sixth Circuit also noted that "factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings." *Id.* In this regard, the Court further observed that this "factor alone may be sufficient to warrant dismissal." *Id.*

Page 6

another case out of this division, the Honorable Mary Ann Whipple rejected the debtors' contention that "the means test calculation is conclusive evidence regarding their ability (or inability) to pay their unsecured creditors." 359 B.R. 849, 853 (Bankr. N.D.Ohio 2007).

The Debtors, however, while not directly disputing that a debtor's ability to pay may be considered in a 'totality of circumstances' analysis under § 707(b)(3), argue that an ability to pay cannot constitute the sole basis for dismissal. (Doc. No. 55, at pg. 2). The Debtors reason that to hold otherwise would render the 'means test' of § 707(b)(2) "meaningless." *Id.* Accordingly, the Debtors reason that, since no other grounds were presented in this matter to warrant dismissal, the fact that they may have a significant amount of income available to repay their unsecured creditors – at least $1,200.00 per month by their own calculation – is irrelevant for purposes of determining the existence of abuse under the 'totality of circumstances' test of § 707(b)(3).

The Debtors' argument – that the 'totality of circumstances' standard for abuse under § 707(b)(3) cannot, in isolation, look solely to a debtor's ability to pay – has been adopted by at least one court. As pointed out by the Debtors, in the case of *In re Nockerts*, the court concluded:

> [W]hile ability to pay is a factor in the totality of circumstances test, and may even be the primary factor to be considered, if it is the only indicia of abuse, the case should not be dismissed under that test. Given the detailed nature of the means test in § 707(b)(2), this Court holds that similar to the old totality of the circumstances test, more than an ability to pay (as shown on the debtor's Schedule I and J) must be shown to demonstrate abuse under § 707(b)(3)(B).

357 B.R. 497, 507 (Bankr. E.D.Wis. 2006). Yet, it is also observed that not all courts have ascribed to this view.

In *In re Henebury*, the court rejected the debtor's contention that, for those whom the 'means test' is applicable, but for whom no presumption of abuse arises, something more than just an ability

Page 7

to pay is required to sustain an action under § 707(b)(3). 361 B.R. 595 (Bankr. S.D.Fla. 2007). The court instead held that a debtor's ability to pay, standing alone, is sufficient cause for dismissal pursuant to the 'totality of circumstances' test of § 707(b)(3)(B). In coming to this conclusion, the court reasoned:

> pre-BAPCPA substantial abuse cases speak generally of the totality of the circumstances test. In contrast, post-BAPCPA § 707(b)(3)(B) specifically delineates the pertinent inquiry as the totality of the circumstances of the debtor's financial situation. Thus, the debtor's total financial situation as a measure of ability to pay, and bad faith are separate and sufficient grounds for dismissal. Either ability to pay or bad conduct in connection with the bankruptcy will warrant dismissal for abuse under § 707(b)(3).

*Id.*, at 607 (internal quotations and citations omitted).

Besides this contrary view, it is also questionable whether in this Circuit, the Sixth Circuit, the court's holding in *In re Nockerts* is viable. As the above quote in *In re Nockerts* shows, the court, in finding that more than just an ability to pay must be shown to demonstrate abuse, was applying the "old" totality of the circumstances test – that is, the pre-BAPCPA test. But insofar as it concerns pre-BAPCPA law, the Sixth Circuit Court of Appeals has ascribed to the opposite view. In the case of *In re Krohn* it was stated, in no uncertain terms, that with regards to a debtor's ability to repay his debts, the existence of that "factor *alone* may be sufficient to warrant dismissal." 886 F.2d at 126 (emphasis added).

Even with the advent of BAPCPA, it is difficult to see how, as the Debtors argue, the 'means test' of § 707(b)(2) would be rendered "meaningless" if a case could be dismissed under § 707(b)(3) based solely upon a debtor's ability to pay. Sections 707(b)(2) and 707(b)(3) serve entirely different functions. On the one hand, the 'means test' of § 707(b)(2) is a rigid, mechanical formula which, under certain conditions, gives rise to a presumption of abuse which the debtor may then rebut. By comparison, § 707(b)(3) is an equitable test, with it being incumbent upon the movant to sustain a

Page 8

showing that the necessary conditions exist to warrant dismissal. *Accord In re McUne*, 358 B.R. 397, 399 (Bankr. D.Or. 2006). Even these concerns aside, the Debtors' reading of § 707(b)(3) presents other more fundamental problems.

To begin with, nothing in the structure of the 'totality of circumstances' test of § 707(b)(3) suggests that a debtor's ability to repay an obligation must, as a prerequisite for dismissal, be coupled with other factors. In fact, the only express limitation placed upon a court's ability when considering the 'totality of circumstances' under § 707(b)(3) is one that seems particularly well suited with limiting the court's focus to solely a debtor's ability to pay. Section 707(b)(3) requires only that the totality of circumstances be germane to the debtor's "financial situation."

Additionally, while any 'totality of circumstances' analysis, by its nature, allows a court to consider a multitude of different factors, the court is not aware of any authority that mandates the consideration of more than one factor. To the contrary, an underlying aim of a 'totality of circumstances' analysis, such as that in § 707(b)(3), is to afford a court flexibility when deciding matters, an aim that would be frustrated if an implicit mandate were to be found in such a test requiring a court to consider to multiple factors. *See Amoco Rocmount Corp. v. Anschutz Corp.*, 7 F.3d 909, 915 (10th Cir. 1993) (a totality of the circumstances approach provides a court needed flexibility to address the myriad situations that may arise).

The Debtors' reading of § 707(b)(3) also ignores an underlying reality. When conducting any "ability to pay" analysis, a court is often considering multiple factors. For example, in *In re Krohn*, the Sixth Circuit gave these two examples of factors that could be involved in any 'ability to pay' inquiry: "whether the debtor enjoys a stable source of future income"; and "whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." 886 F.2d 126-27.

Page 9

In re Robert and Sherrie Haar
Case No. 06-31270

Given, therefore, all these countervailing considerations, the Court must reject the Debtors' position that, in weighing the 'totality of circumstances' under § 707(b)(3), the Court cannot consider solely a debtor's ability to pay. In sum, the Court will not read into § 707(b)(3) a requirement that does not exist.

In looking at the Debtors' ability to repay their debts, the UST points to these two underlying facets of the Debtors' financial situation: First, it points to excessive expenses claimed by the Debtors in their household budget, including but not limited to the costs to maintain four cars and the money allocated for five cell phones. Secondly, the UST points to the additional income the Debtors now have available as the result of them having surrendered their residence.

On the first point made by the UST, the Court agrees; the cost to maintain four cars and five cell phones is not an appropriate allocation of financial resources for the Debtors who have come to this Court pleading that they cannot pay their voluntarily incurred obligations. But even setting this concern aside, the UST's second point, regarding the surrender of their residence, is dispositive on the issue of the Debtors' ability to pay.

Since surrendering their residence, the Debtors' own income and expense figures show that they now have at least $1,200.00 available per month to service their unsecured debt. Moreover, the evidence revealed that this available income is likely to continue for the foreseeable future. Under any measure, the likely permanence of such a significant amount of monthly disposable income, when set against their unsecured debt of $66,442.00, provides the Debtors the ability to repay their unsecured debts. Taken over 60 months, the length of a Chapter 13 plan, the availability of this income affords the Debtors the ability to repay $72,000.00, more than 100% of their unsecured debt.

However notwithstanding the availability of this extra income, the Debtors maintain that, since they surrendered their home postpetition, any funds made available to them as the result of the

Page 10

**In re Robert and Sherrie Haar**
**Case No. 06-31270**

surrender is not a proper subject of this Court's inquiry under § 707(b)(3). This is because, according to the Debtors, the consideration of such income goes contrary to the 'snapshot' approach which this Court adopted when it previously denied the Motion of the UST to Dismiss under the 'means test' of § 707(b)(2). *In re Haar*, 360 B.R. at 767. Under the 'snapshot' approach, a debtor's financial situation is judged by reference to solely the amount of monthly income the debtor has available on the date of the petition. Simply put, the debtor's financial situation is viewed as being frozen in place at the time of the petition.

While not expressly stated as such, the logic of the Debtors' position seems, at least in part, to rest on the conclusion that one result compels another. That is, by applying a 'snapshot' approach to the 'means test' of § 707(b)(2), the same result is compelled under the 'totality of circumstances' approach of § 707(b)(3). However, insofar as the Debtors do base their position on this reasoning, it misses the mark.

In the first instance, this Court's 'snapshot' approach was based upon its interpretation of the particular statutory language of § 707(b)(2), thus making any direct linkage of this Court's analysis to § 707(b)(3) tenuous at best. The two methods for determining abuse under §§ 707(b)(2) and (b)(3) are also, as previously noted, entirely different in their approach. The 'means test' of § 707(b)(2) is a strict mechanical test, while § 707(b)(3)'s approach is grounded in equity. *In re Peoples*, 345 B.R. 840, 843 (Bankr.N.D.Ohio 2006); *In re Hartwick*, 352 B.R. 867, 870 (Bankr. D.Minn. 2006).

More important, the statutory language of § 707(b)(3), itself, makes it clear that a court is not to construe this provision as having any direct linkage with the 'means test' of § 707(b)(2). In its opening, § 707(b)(3) sets forth, in no uncertain terms, that:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter *in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted,* . . .

Page 11

(emphasis added). Still, despite the lack of any direct linkage between § 707(b)(2) and § 707(b)(3), this does not answer the actual question posed by the Debtors: Whether the application of § 707(b)(3) requires a 'snapshot' approach?

The starting point in any matter of statutory interpretation is the language of the statute itself. *Toib v. Radloff*, 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). Under § 707(b)(1), the primary provision governing dismissal for abuse, it is provided, in relevant part, that a court "may dismiss a case *filed* . . . if it finds that the *granting of relief* would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1) (emphasis added). From this, this Court has held that "§ 707(b)'s concern must be focused on the circumstances as they existed at the time a debtor's case is commenced." *In re Pier*, 310 B.R. 347, 355 (Bankr. N.D.Ohio 2004).[4] This, as later noted by the Court, "conforms to the general tenet in bankruptcy that circumstances are to be gauged from the petition date, with the Bankruptcy Code replete with examples where any deviation therefrom is made explicit." *In re Haar*, 360 B.R. at 766.

Yet, gauging a debtor's circumstances as of the date of the petition does not thereby compel the 'snapshot' approach advocated by the Debtors. As is the case with all human affairs, a person's financial circumstances are fluid. This, for a debtor, is especially true, considering that their very purpose in filing bankruptcy is to seek an adjustment of their financial situation.

In line with this fluidity, evidence of a debtor's future income and expenses has always been a proper subject of a § 707(b) analysis. In *In re Krohn*, the Sixth Circuit observed that "[a]mong the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings." *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989). Furthermore, gauging matters from the date of the petition, while at the same time looking to a debtor's postpetition financial

---

[4]*But see In re Cortez*, 457 F.3d 448, 454-55 (5th Cir. 2006) (date of discharge key event).

Page 12

circumstances, does not create an inconsistency so long as there exists a nexus between the two. As was explained in detail by this Court in *In re Pier*:

> the focus of § 707(b) on the petition date does not mean that postpetition revisions to a debtor's income and expenses are automatically irrelevant. When a debtor files a bankruptcy petition, they are required to disclose their current income and expenses, in essence, providing a snapshot of their financial affairs as of the date of the petition. Under certain circumstances, however, this may mean that prepetition considerations relevant to a debtor's "ability to pay" his or her debts for purposes of § 707(b) would not be readily discernable from the schedules. To illustrate, a debtor who files bankruptcy in anticipation of a job loss would still, at the time of the petition, show employment income. Yet the anticipation of the job loss would likely have a direct correlation with the underlying bankruptcy, and thus possibly mitigate against an action brought to dismiss based upon "substantial abuse" under § 707(b). Having the exact opposite effect, soon to be received payments from a deferred annuity, although again relevant to a determination of a debtor's "ability to pay," would not yet be listed as income in the debtor's schedules.

> Fairness thus dictates (for both creditors and the debtor) that postpetition revisions in a debtor's income and expenses be considered to the extent that they aid in providing an accurate picture of the debtor's financial status at the time of filing. Given, however, that § 707(b) is still only concerned with a debtor's prepetition financial condition, such revisions are only relevant in a § 707(b) analysis if there exists a strong nexus with the circumstances giving rise to the bankruptcy.

310 B.R. at 355.

There is also no reason why this practice should not be afforded viability post-BAPCPA, thereby allowing, under § 707(b)(3), an examination of a debtor's financial circumstances past the date of the debtor's petition. First as already stated, *supra*, pre-BAPCPA case law regarding § 707(b) is generally applicable in the post-BAPCPA environment. Second, to hold otherwise would create the potential that debtors could negate the application of § 707(b)(3) by simply timing their

Page 13

bankruptcy filing around certain events, a result that is incompatible with the equitable nature of the 'totality of circumstances' test of § 707(b)(3). Thus, for example, in the recent case of *In re Henebury*, the court found it appropriate and equitable to include, when determining the propriety of a dismissal under the 'totality of circumstances,' the debtor's income from a teaching job started just after the debtor filed her petition. 361 B.R. 595, 613 (Bankr. S.D.Fla. 2007). *See also In re Lenton*, 358 B.R. 651, 654 (Bankr. E.D.Pa. 2006) (in examining a debtor's ability to pay, the court must consider both the debtor's actual and anticipated financial situation over the applicable Chapter 13 commitment period).

In summation, the Court finds that the income made available to the Debtors after they surrendered their residence may be considered when analyzing whether their case should be dismissed for abuse under the 'totality of circumstances' test of § 707(b)(3). Furthermore, based upon the availability of this income, the Court finds that, under the 'totality of circumstances' test of § 707(b)(3), the Debtors have the ability to repay their unsecured creditors, thereby making the granting of relief in this case an abuse of the bankruptcy process as provided in § 707(b)(1). Pursuant, however, to § 105(a) and § 707(b)(1), the immediate dismissal of this case will be stayed so as to afford the Debtors the opportunity to convert this case to one under Chapter 13 of the Bankruptcy Code.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Page 14

**In re Robert and Sherrie Haar**
**Case No. 06-31270**

Accordingly, it is

***ORDERED*** that the Clerk, United States Bankruptcy Court, is directed to prepare for presentation to the Court an order of dismissal under 11 U.S.C. § 707(b)(1) if, at the opening of business on Monday, June 18, 2007, this case is still proceeding under Chapter 7 of the United States Bankruptcy Code.

***IT IS FURTHER ORDERED*** that, subject to the Debtors' election to convert this case, the Motion of the United States Trustee to Dismiss under 11 U.S.C. § 707(b)(1) and § 707(b)(3), be, and is hereby, GRANTED.

Dated: June 4, 2007

Richard L. Speer
United States
Bankruptcy Judge

Page 15

# *CERTIFICATE OF SERVICE*

Copies were mailed this 4th day of June, 2007, to the following parties:

Sherrie H & Robert W Haar
385 Commodore Way
#1
Perrysburg, OH 43551

Patricia A Kovacs
500 Madison Ave
#525
Toledo, OH 43604

Gilbert B Weisman
c/o Becket & Lee
PO Box 3001
16 General Warren Blvd
Malvern, PA 19355

Holly N Wolf
1400 Goodale Blvd
#200
Grandview, OH 43212

Maria D. Giannirakis
201 Superior Ave E
#441
Cleveland, OH 44114-1240

Elizabeth A Vaughan
1709 Spielbusch Ave.
#107
Toledo, OH 43604

/s/ Robert C.W. Birmingham
Deputy Clerk, U.S. Bankruptcy Court